*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* WINSTON, Minors.

UNPUBLISHED
July 21, 2022

No. 358914
Macomb Circuit Court
Family Division
LC Nos. 2020-000208-NA;
              2020-000209-NA

Before: SHAPIRO, P.J., and RICK and GARRETT, JJ.

PER CURIAM.

The trial court terminated respondent-mother's parental rights to DLW and DMW under MCL 712A.19b(3)(b)(*ii*) (failure to prevent sexual abuse), MCL 712A.19b(3)(g) (failure to provide proper care and custody for the children), and MCL 712A.19b(3)(j) (reasonable likelihood of harm). Respondent pleaded no-contest to these statutory grounds, but argues that the trial court clearly erred by finding that termination of her parental rights was in the children's best interests. The evidence established that respondent was unwilling to take the necessary steps to keep her children safe from abuse, and that the children's grandmother provided a stable and permanent placement. Accordingly, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Respondent has four children: two sons, KW and DL, and two daughters, DLW and DMW. KW, DL, and DLW's and DMW's father are not parties to this appeal.

In June 2020, Child Protective Services (CPS) received allegations that DLW and DMW had been sexually abused by their brother KW, KW's friend, and the friend's father.[1] DLW and DMW had reported the abuse to a social worker, Dawn Krisel, at a family therapy session, and Krisel filed a CPS report. In August 2020, DLW and DMW were forensically interviewed and

---

[1] At this time, DLW was nine years old, DMW was 7 years old, and KW was about 15 years old.

again disclosed being sexually abused by these three individuals.[2]  Respondent left DLW and DMW in the care of KW while she went to work, but KW had been diagnosed with Asperger's syndrome and Attention Deficit Hyperactivity Disorder (ADHD) and could not care for children. KW would take DLW and DMW to the home of the friend's father, where at least some of the abuse occurred.  The children also disclosed that respondent knew about the abuse but did not believe them.  DLW reported that she overheard respondent telling DLW's aunt that DLW was lying.  DMW disclosed that after she told respondent about an incident of sexual abuse perpetrated by KW, respondent told DMW to stop talking about it because she could get taken away.

In September 2020, a referee entered an order for the immediate removal of the children from respondent's care.  After a preliminary hearing, the referee ordered that the children remain under the care and custody of petitioner, the Department of Health and Human Services (DHHS). DLW and DMW were placed with their grandmother, with whom they were already residing.

DHHS petitioned to terminate respondent's parental rights in October 2020.  Besides the sexual abuse allegations, the petition alleged that respondent continued to allow KW to babysit DLW and DMW after they had disclosed to respondent that KW sexually abused them.  After CPS informed respondent of the sexual abuse allegations, she moved to terminate the legal guardianship that KW had with his paternal grandparents so that KW could reside with respondent, DLW, and DMW.  Respondent also had a prior CPS history; separate investigations in 2014 and 2019 substantiated allegations that she physically abused DL and that she left DLW and DMW home alone unattended without food.

At a June 2021 adjudication hearing, respondent pleaded no contest to the jurisdictional grounds alleged in the petition.  Respondent also pleaded no contest to the three statutory grounds for termination, MCL 712A.19b(3)(b)(ii) (failure to prevent sexual abuse), MCL 712A.19b(3)(g) (failure to provide proper care and custody for the children), and MCL 712A.19b(3)(j) (reasonable likelihood children will be harmed if returned to the home of the parent).  The court held there was a factual basis for respondent's plea, accepted the plea, and exercised temporary wardship over DLW and DMW.  Respondent expressly retained the ability to challenge whether termination of was in DLW's and DMW's best interests.

In August 2021, the trial court held a two-day hearing to decide the best-interests issue. DHHS called three witnesses: Steven Haag, the foster care worker; Krisel, the children's therapist; and the children's grandmother.  The witnesses' testimony was generally consistent, with each concluding that the termination of respondent's parental rights was in the children's best interests.

Haag testified that respondent attended most of her scheduled visits with the children but that her behavior at the visits was not always appropriate.  In one instance, DLW and DMW brought up being left with KW, and respondent denied ever having left them in his care.  In another instance, respondent suggested DLW was overweight and was unapologetic about it, and DLW cried about the comments when she got home.  DLW and DMW were also afraid to tell respondent that she hurt them when she did their hair during visits.  Both children reported feeling sad after

---

[2] DLW was also sexually abused by her older brother DL in a prior incident.  DL was prosecuted and placed in a guardianship with his paternal grandmother.

visits with respondent. However, Haag acknowledged that both children had cell phones and called respondent often, and that they would likely feel a sense of loss if respondent's parental rights were terminated.

Haag and Krisel testified that DLW and DMW had a bond with respondent, but that is was more of a sibling-type bond than an appropriate parent-child bond. The grandmother also testified that there was a bond between the children and respondent, and allowing DLW and DMW to have some contact with respondent in the long term was in their best interests. Still, all three agreed that DLW and DMW, at times, did not want to see respondent and worried about their safety with respondent.

Krisel testified about the children's disclosures of sexual abuse during their therapy sessions, which were held at least once a week beginning in June 2020. DMW also told Krisel that respondent and respondent's friend once touched her in her vaginal area. DLW and DMW also disclosed an incident where they witnessed respondent having sex with a man in a motel room while DLW and DMW were on the floor. Respondent admitted that this incident occurred and that she believed the children were asleep, and said it was a mistake. Krisel testified that DLW and DMW said they told respondent about the sexual abuse they suffered, and respondent did not believe them and denied that anything had happened. Krisel also testified that she did not believe respondent would be supportive of continuing DLW's and DMW's therapy services, which they were benefiting from. Respondent even went so far as to tell DLW and DMW not to talk to Krisel. Krisel opined that any services that respondent could be provided to assist with her children's treatment would not be successful so long as respondent did not believe that the sexual abuse occurred.

Further, both children expressed they would not feel safe living with respondent, but that they felt safe and comfortable with their grandmother, who was willing to adopt them. The grandmother was meeting the children's educational and health needs. DLW required an individualized education plan (IEP) for reading and math. Haag testified that the grandmother was properly addressing DLW's IEP needs, while respondent made DLW feel embarrassed about needing additional help in school. DMW had made significant progress in therapy. DLW suffered from low self-esteem and depression, and needed a stable, caring, and emotionally supportive person to care for her. Haag and Krisel believed that the grandmother would provide finality, stability, and permanency for DLW and DMW. The grandmother testified that she was willing to adopt DLW and DMW and that she would continue the children's therapy if they were permanently placed with her.

The grandmother testified that respondent could not provide stable housing for DLW and DMW. Before this case, respondent moved with DLW often, with two years being the longest time they had lived in one place. Respondent was living in Baldwin, Michigan, with DLW and DMW until December 2019, when she was subject to another CPS investigation over inadequate housing for the children. Respondent moved with the children to the Detroit area, and they stayed in a motel for a month. The grandmother also testified that respondent and the children stayed with her several times for months at a time. At the time of the hearing, respondent was living with a convicted, violent felon, and respondent would not let Haag come to the home. While respondent testified that the man would move out if the children were returned to her, she would nevertheless continue their relationship.

Respondent testified that she first learned of the abuse after the CPS investigation in this case was opened. Respondent accused DLW and DMW of lying about whether she learned of the sexual abuse before the CPS case. Respondent took some responsibility for the abuse because she did not pay enough attention and missed the warning signs. If her rights were not terminated and DLW and DMW were returned to respondent, respondent said she would protect them from further abuse by not leaving them alone, looking out for the signs of abuse, and keeping KW away from them. When asked what she would do differently if she could change the past, respondent said, "if they let me know, I would've gone straight to the police." Respondent testified that she would support DLW and DMW continuing in therapy. But DLW had been participating in therapy after the abuse by DL, and respondent did not continue the therapy after moving from Baldwin to Detroit. Respondent also acknowledged that she tried to terminate KW's and DL's guardianship and return them to her care, but denied trying to bring them into the same home as DLW and DMW, reasoning that DLW and DMW were not currently living with her.

After the hearing, the trial court issued a written opinion and order finding that it was in the best interests of DLW and DMW to have respondent's parental rights terminated. The court found that the children had a bond with respondent, but that it was more of a friendship. As for respondent's parenting ability, the court found that respondent improperly allowed KW to watch DLW and DMW for long periods, leading to their abuse. Respondent could not provide stable housing for DLW and DMW, and would likely expose the children to the violent felon with whom she was currently living. Meanwhile, DLW and DMW were being properly cared for by their grandmother, who was providing for DLW's and DMW's physical, emotional, and educational needs and was willing to permanently care for the children. On the basis of those findings, the trial court determined that terminating respondent's parental rights was in the best interests of DLW and DMW. This appeal followed.

## II. ANALYSIS

Respondent argues that the trial court erred when it found that termination of her parental rights to DLW and DMW was in the children's best interests.

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012), citing MCL 712A.19b(5). We review a trial court's best-interest findings for clear error. *Olive/Metts*, 297 Mich App at 40. "Clear error exists when some evidence supports a finding, but a review of the entire record leaves the reviewing court with the definite and firm conviction that the lower court made a mistake." *In re Dearmon*, 303 Mich App 684, 700; 847 NW2d 514 (2014). "[W]hether termination of parental rights is in the best interests of the child must be proven by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013).

When determining whether termination is in the best interests of the children, the focus is on the child, not the parent. *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016). Factors relevant to the best-interest determination include "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *Olive/Metts*, 297 Mich App at 41-42 (citations omitted). "The trial court may also consider a parent's history of domestic violence, the

parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014). Children's placement with relatives generally weighs against termination, and the trial court must address this factor when determining whether termination is in the children's best interests. *In re Mason*, 486 Mich 142, 164; 782 NW2d 747 (2010). In cases involving multiple children, it will typically be in the children's best interests to stay together, but the trial court "has a duty to decide the best interests of each child individually." *Olive/Metts*, 297 Mich App at 42. However, the trial court need not make factual findings about *each* child's best interests, unless they significantly differ from one another. *White*, 303 Mich App at 715-716.

The trial court found, and there is no dispute, that DLW and DMW share a bond with respondent. However, that bond was described by multiple witnesses as a sibling bond or one of friendship, rather than an appropriate parent-child relationship. While the bond between respondent and DLW and DMW may weigh in her favor, the other factors establish that termination of respondent's parental rights was in the children's best interests.

Over several years, respondent has shown an inability to improve her parenting skills, as supported by the evidence of prior CPS investigations, as well as testimony about unstable housing and inadequate food for the children. Most concerning, however, is the considerable evidence supporting that respondent is not serious about keeping DLW and DMW safe from abuse. For instance, respondent tried to terminate DL's and KW's guardianships and have them returned to her care, despite respondent's knowledge of their sexual abuse against DLW and DMW. The evidence also substantiates that respondent consistently disbelieved or downplayed her children's disclosures. Because of respondent's failure to fully accept the abuse allegations, Krisel and the grandmother testified that they did not believe that respondent would continue DLW's and DMW's therapy, jeopardizing their recoveries.[3] Indeed, when they moved from Baldwin to Detroit, respondent failed to keep DLW in therapy for the prior abuse she suffered. DLW and DMW also expressed they did not always feel safe with respondent, and they were concerned that she would not protect them from future abuse.

The trial court also found that the DLW's and DMW's need for permanency, stability, and finality supported terminating respondent's parental rights. Although a relative placement generally weighs against termination, *Mason*, 486 Mich at 164, the evidence demonstrated that DLW and DMW would be best served by a permanent placement with their grandmother. Even before this case, DLW and DMW had lived with their grandmother several times. Under their grandmother's care, DLW and DMW were progressing in their therapy, having their health and educational needs met, and visibly improving in their behavior and overall well-being. With regard to their permanent placement, DLW and DMW mainly wanted to be in a place where they would not be abused again. The children felt safe and comfortable with their grandmother, and

---

[3] The evidence demonstrated that a supportive and consistent recovery was crucial to the children's long-term success, as the trauma they had suffered was profound. For example, at the August 2020 forensic interview, eight-year-old DMW referred to her adult abuser—the father of KW's friend—as her "boyfriend." Haag also testified that DMW struggled with the act of swallowing medication because it brought up traumatic memories from the sexual abuse.

she was willing to adopt them and support their recovery. Consequently, the evidence strongly supported that termination of respondent's parental rights, and permanent placement with their grandmother, was in DLW's and DMW's best interests.

Affirmed.

/s/ Douglas B. Shapiro
/s/ Michelle M. Rick
/s/ Kristina Robinson Garrett